3-02-0738 _________________________________________________________________

 IN THE

 APPELLATE COURT OF ILLINOIS

 THIRD DISTRICT

 A.D., 2003

ILLINOIS BELL TELEPHONE  ) 

COMPANY,                        ) 

                                )                               

Petitioner-Appellant,      )                       

       )

v.                         )                 

  ) 

ILLINOIS COMMERCE COMMISSION,   ) Case Nos. 3--02--0738 and

AT&T COMMUNICATIONS OF ILLINOIS,) 3-02-0920 (Consolidated)

INC., TCG ILLINOIS, TCG CHICAGO,)         

TCG ST. LOUIS, WORLDCOM, INC.,  )                     

MCLEODUSA TELECOMMUNICATIONS    )                   

SERVICES, INC., XO ILLINOIS,    )

INC., NORTHPOINT COMMUNICATIONS,)

INC., RHYTHMS NETCONNECTION AND )

RHYTHMS LINKS, INC., SPRINT     )

COMMUNICATIONS L.P., FOCAL      )

COMMUNICATIONS CORPORATION OF   )

ILLINOIS, and GABRIEL           )

COMMUNICATIONS OF ILLINOIS, INC.)

INC.,                           )

                                )

 Respondents-Appellees.     )

________________________________________________________________

JUSTICE SCHMIDT delivered the opinion of the court:

________________________________________________________________

This is an appeal from a series of orders issued by the Illinois Commerce Commission (the Commission).  The orders set forth parameters to which the petitioner, Illinois Bell Telephone Company (d/b/a Ameritech Illinois), must adhere when allowing competing local exchange carriers (CLECs) access to its local network.  Petitioner takes issue with three mandates contained within the orders.  

The orders forced the petitioner to file a tariff relating to its local network.  Petitioner claims that the Commission lacked the authority to order certain provisions contained within the tariff.  Petitioner further claims that other aspects of the orders, related to ensuring petitioner’s compliance with performance goals, were arbitrary and capricious and not supported in fact.  

The CLECs and the Commission, respondents, believe the Commission acted properly when issuing its orders.  

BACKGROUND

In 1998, Ameritech Illinois (and its parent company, Ameritech Corporation) and SBC Communications, Inc., began the merger process.  Ameritech Illinois filed an application seeking the Commission’s approval of the merger.  The Commission approved the application in September of 1999 subject to certain conditions.  These conditions were contained within the “merger approval order” (merger order) which took effect on the merger closing date of October 8, 1999.  The merger order was consented to by Ameritech Illinois, SBC Communications, Inc., and the Commission.

The merger order contained language noting that “[e]xcept where other termination dates are specifically established, all conditions set out below shall cease to be effective and shall no longer be binding in any respect three years after the Merger Closing Date.”  At issue in this appeal is Condition 30, titled “Performance Measuring, Benchmarks and Liquidated Damages,” which did not specifically establish an alternative closing date. 

   True to its title, Condition 30 directed petitioners to “establish performance measurements, benchmarks and provide for liquidated damages.”  The merger order then described a process through which these items would be established. Approximately 150 performance measurements divided into 3,000 categories were established.  The liquidated damages established took the form of automatic payments to be made to the CLECs and State of Illinois in the event that performance standards were not met.  This plan of determining performance measurements and then paying liquidated damages for not meeting acceptable standards became known as the “remedy plan.”  The remedy plan agreed to by petitioners at the time the merger order was entered was premised on a similar plan in effect in Texas.

A system containing such a large number of performance measurements broken down into an even greater number of categories lends itself to random variations.  These random variations may give the appearance of noncompliance with performance standards when in fact compliance is occurring.  The Texas remedy plan originally proposed contained a “k-table,” which is a statistical mechanism put in place to prevent the imposition of payments based solely on random variation.  

Condition 30 further set forth a collaborative process by which performance measurements, standards, benchmarks and remedies could be adjusted.  The collaborative process included representatives from Ameritech, the CLECs and the Commission.  The final paragraph of Condition 30 allowed any participant in the collaborative process to recommend amendments to the remedy plan. If a dispute over the recommended amendment could not be resolved by the parties through the collaborative process, then the party recommending the amendment could ask the Commission to resolve the dispute.  

Ameritech and the CLECs came to terms regarding many items during the collaborative process but could not agree on the level of payments Ameritech would be required to pay if it failed to meet performance standards.   A joint petition was filed by Ameritech and the CLECs asking the Commission to resolve this dispute.  For the next 17 months, hearings were held, testimony presented and multiple briefs filed by both parties.  Eventually, the Commission ruled on the disputed items and entered a “final order” on July 10, 2002.  

The final order put in place the “revised remedy plan,” which doubled the amount of liquidated damages set forth in the merger order to be paid by Ameritech in the event it fails to meet performance standards.  Moreover, the final order eliminated the k-table, opting to set a standard 5% error rate to account for the effect of random variation.

The Commission also commented on the duration of the remedy plan in the final order.  The Commission noted: 

“The only conclusion that can be reached is that Condition 30, and consequently the Remedy Plan, expires in three years. *** Additionally, no party has given us a legal basis for extending the deadlines included in the Merger Order.  We are therefore left with the conclusion that the Remedy Plan, as a condition to merger approval, expires in three years from the merger closing date, or October 2002.” 

The final order discusses who may avail themselves to the revised remedy plan.  Commission’s staff recommended: 

“Ameritech should also be required to revise its existing tariff to reflect the changes made pursuant to this Order.  This will ensure that those carriers that do not have an Interconnection Agreement with Ameritech will have the benefit of the Remedy Plan.  Additionally, Staff proposes that pending the filing of such a tariff, the Modified Remedy Plan ordered in this docket should be offered to the CLECs that are currently using the Plan through an 'opt-in.'

In its analysis and conclusions section, the Commission noted:

“We also agree with Staff that Ameritech should be required to file a tariff to reflect the changes made pursuant to this Order.  At present, Ameritech’s tariff and Interconnection Agreements incorporate the current Remedy Plan.  The Performance Remedy Plan in this Docket shall replace the current Remedy Plan in Ameritech’s pertinent tariff, and, it shall be incorporated into all currently effective Interconnection Agreements in the form of an Amendment to the Interconnection Agreement.

So the record is clear, the Revised Plan attached hereto supercedes the previous Remedy Plan, and, any 'opting in' by a current or new CLEC should be followed with an Amendment to the Interconnection Agreement.”

The final order then directs Ameritech to “file a tariff to reflect the revisions to the Plan that are reflected in this Order.”  

When Ameritech filed its tariff, it included language in a footnote stating that the tariff would expire on October 8, 2002, which was the three-year anniversary of the merger approval order.  On October 1, 2002, without notice to Ameritech, the Commission entered an “Order on Reopening,” which directed the chief clerk of the Commission to strike the footnote in Ameritech’s tariff that indicated the tariff expired on October 8, 2002.  The petitioner filed an application for rehearing of the order on reopening, which was denied.  This appeal followed.

STANDARD OF REVIEW

The Illinois Commerce Commission is an administrative agency, and judicial review of its orders is limited.  
Illinois Power Co. v. Illinois Commerce Comm'n
, 316 Ill. App. 3d 254, 736 N.E.2d 196 (2000).  The Commission’s findings of fact are 
prima facie
 correct and will not be overturned by a reviewing court unless they are against the manifest weight of the evidence, beyond the statutory authority of the Commission, or violative of constitutional rights.  
People ex rel. Hartigan v. Illinois Commerce Comm'n
, 148 Ill. 2d 348, 592 N.E.2d 1066 (1992).  However, the Commission’s interpretation of a question of law is not binding on a court of review.  
Archer-Daniels-Midland Co. v. Illinois Commerce Comm'n
, 184 Ill. 2d 391, 704 N.e.2d 387 (1998).   The review of a question of law in an appellate court is 
de novo
.  
Continental Mobile Telephone Co. v. Illinois Commerce Comm'n
, 269 Ill. App. 3d 161, 645 N.E.2d 516 (1994). 

 ANALYSIS

Doubling of the Remedies

Petitioner contends that the Commission’s doubling of the “remedies” is arbitrary, capricious and lacks evidentiary support.  We note that petitioner violates Supreme Court Rule 341 (188 Ill. 2d R. 341) by not including a concise statement of the applicable standard of review for each issue.  However, we take petitioner’s statement, that the Commission’s actions lacked evidentiary support, to mean petitioner is claiming such actions were against the manifest weight of the evidence.  We disagree.

After taking evidence and hearing arguments for 17 months, the Commission determined that original remedy amounts failed to provide an adequate incentive to Ameritech to provide acceptable levels of service to the CLECs .  This conclusion was based upon evidence that performance deficiencies existed in “nearly half” of the measured categories for a three-month period.  Moreover, the assessments against Ameritech called for in the Texas remedy plan did not influence Ameritech’s behavior whatsoever.  The Commission found that “the Ameritech Plan will not provide sufficient incentives for Ameritech to improve its service” and that “the current system is not working and something must be done to give Ameritech meaningful incentive to provide the CLECs with service that is not substandard.”  

Petitioner offers no argument to dispute evidence introduced that it failed to meet performance standards or opinions that the remedies called for in the original plan provided inadequate incentive to meet performance standards.  Instead, petitioner argues that doubling the remedies is punitive.  Petitioner continues with hornbook law regarding prohibitions against enforcing liquidated damages which are punitive.  Petitioner notes that the merger approval order refers to the remedies as liquidated damages more than 30 times but the final order refers to the assessments for inadequate service as “payments.”   

Petitioner contends that this is an impermissible attempt by the Commission to change the nature of the remedy plan from one put in place to ensure compliance with acceptable performance standards to one merely seeking to punish the petitioner.  We disagree.

While petitioner spends a great deal of time illustrating the amount payments increased as a result of the new plan, it offers no explanation as to why this amount is punitive and not merely the amount necessary to provide Ameritech with an adequate incentive to provide quality service. Despite petitioner’s protestations to the contrary, there is ample evidence in the record to support the Commission’s finding that increased remedies were necessary to ensure that Ameritech would meet an acceptable level of performance standards and that the increases are not punitive in nature.   

Elimination of the k-table

As stated above, the purpose of the k-table in the remedy plan was to account for random variations associated with monitoring the large number of performance standards.  The Commission found “that Staff’s proposal, to set a standard 5% Type 1 error rate for all individual tests and to eliminate the k-table, is supported by the evidence and properly accounts for the effect of random variation.”  Petitioner claims the record does not support the deletion of the k-table and implementation of a standard 5% error rate to account for random variation.  We hold that there is sufficient evidence in the record to support the Commission’s findings.

Numerous witnesses, including Dr. Michael Kalb, Dr. Melanie K. Patrick and Karen W. Moore all testified as to the inadequacy of the k-table.  They opined that the use of the k-table allowed for repeated failures in service to occur.  The k-table characterized such failures as random variations when in fact they were clearly performance failures.  Ms. Moore stated, “[i]t is possible, and in this case actually occurred, for a submeasure to fail month after month after month, and never be remedied.”  

Illinois courts give great deference to the Commission’s decisions, as they are the judgments of an administrative body with tremendous expertise in the field of public utilities and with the qualifications to interpret specialized and highly technical evidence.
  United Cities Gas Co. v. Illinois Commerce Comm'n
, 163 Ill. 2d 1, 643 N.E.2d 719 (1994).  We find there was ample evidence in the record to support the Commission’s decision to eliminate the k-table and impose a standard 5% error rate to compensate for random variation.

Commission’s Authority

Petitioner contends that the Commission lacked the authority to force it to file a tariff extending Condition 30 past the three-year duration contained within the merger approval order.  Petitioner challenges the Commission’s actions on numerous grounds including due process, preemption, estoppel and that the order is an arbitrary and capricious departure from the Commission’s prior conclusions.

The Commission’s final order makes it clear that “those carriers that do not have an Interconnection Agreement with Ameritech will have the benefit of the Remedy Plan.”   Thus, the tariff Ameritech was forced to file allows any CLEC, whether currently doing business with Ameritech or one hoping to in the future, to have the benefit of the remedy plan.  Ameritech claims the Commission does not have the authority to make such an order.  We agree.

State law is preempted under the supremacy clause (U.S. Const., art. VI, cl. 2) in three circumstances.  First, Congress can define explicitly the extent to which its enactments preempt state law.  
Shaw v. Delta Air Lines, Inc.
, 463 U.S. 85, 77 L. Ed. 2d 490, 103 S. Ct. 2890 (1983).  Second, in the absence of explicit statutory language, state law is preempted where there is a “scheme of federal regulation *** so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.”  
Rice v. Santa Fe Elevator Corp.
, 331 U.S. 218, 230, 91 L. Ed. 1447, 1459, 67 S. Ct. 1146, 1152 (1947).  Finally, state law is preempted to the extent that it actually conflicts with federal law.
  English v. General Electric Co.
, 496 U.S. 72, 110 L. Ed. 2d 65, 110 S. Ct. 2270 (1990). 

Petitioner argues that the Commission’s order actually conflicts with section 252 of the Telecommunications Act of 1996. 47 U.S.C. §252 (2000).  Section 252 of the Telecommunications Act of 1996 (the Act) sets forth “procedures for negotiation, arbitration, and approval of agreements” between CLECs and incumbent local exchange carriers (ILEC) such as Ameritech. 47 U.S.C. §252 (2000). These agreements are known as interconnection agreements.  The process set forth by section 252 of the Act is very specific.  First the Act mandates that “upon receiving a request for interconnection, services, or network elements *** an incumbent local exchange carrier may negotiate and enter into a binding agreement with the requesting telecommunication carrier.” 47 U.S.C. §252(a)(1) (2000).  The Act places on incumbents the duty to “negotiate in good faith the terms and conditions of such agreements.”  47 U.S.C. §251(c)(1) (2000).    However, either party to the negotiation may ask the appropriate state commission to mediate any unresolved issues.  47 U.S.C. §252(a)(2) (2000).  If negotiations and mediation do not produce an agreement, either party can ask the state commission to undertake binding arbitration.  47 U.S.C. §§252(b) through (d) (2000).  

Once an agreement is reached, either through negotiation or arbitration, the Act allows for a party to petition the Federal Communications Commission to intercede if the state commission fails to approve the agreement in a timely manner.  47 U.S.C. §§252(e)(5) (2000). Finally, the Act allows any party aggrieved by a state commission’s decision to appeal the decision to a federal district court.  47 U.S.C. §252(e)(6) (2000).

Petitioner claims that the tariff it was ordered to file by the Commission allows CLECs that do not have an existing interconnection agreement to ignore this process as set forth in section 252 of the Act.  Any CLEC could merely “opt-in” to the tariff without having to negotiate, mediate or arbitrate with Ameritech.  Moreover, if CLECs are allowed to merely opt in to the tariff, Ameritech has lost its right of federal district court review.  This, Ameritech claims, is an actual conflict between what has been ordered by the Commission and the process prescribed  by federal law to create interconnection agreements.

We agree. 

While various courts have held that section 252 of the Act does preempt various actions taken by state regulatory commissions (see 
MCI Telecommunications Corp. v. GTE Northwest, Inc.,
 41 F. Supp. 2d 1157 (D. Or. 1999); 
Verizon North, Inc. v. Strand
, 309 F.3d 935 (6th Cir. 2002); 
Pacific Bell v. Pac-West Telecomm, Inc.
, 325 F.3d 1114 (9th Cir. 2003)), other courts have held certain actions taken by state agencies were not preempted (see 
Michigan Bell Telephone Co. v. MCIMetro Access Transmission Services, Inc.
, 323 F.3d 348 (6th Cir. 2003); 
U.S. West Communications, Inc. v. Sprint Communications Co., L.P.
, 275 F.3d 1241 (10th Cir. 2002).  

We find the factual situation present in 
Verizon North v. Strand
 most analogous to the case at bar and that court’s reasoning especially sound. In 
Verizon North v. Strand
, the Michigan Public Service Commission (MPSC) forced Verizon to publish a tariff that allowed CLECs to purchase services without going through the negotiation and arbitration process called for in section 252 of the Act. The court found that such an order established a different route for competitors to obtain services and network elements from incumbents.  
Verizon North v. Strand
, 309 F.3d at 939.  The order of the MPSC required the incumbent local exchange carrier 'to file tariffs offering its network elements and services for sale on fixed terms to all potential entrants without the necessity of negotiating an interconnection agreement.'  
Verizon North v. Strand
, 309 F.3d at 939, quoting 
Verizon North, Inc. v. Strand
, 140 F. Supp. 2d 803, 809 (W.D. Mich. 2000). (Emphasis omitted.)  The court continued, “[i]n this way, the MPSC order permits competitors to purchase the services and elements directly off of the tariff menu, obviating the need to negotiate or arbitrate an interconnection agreement.” 
Verizon North
, 309 F.3d at 939-40.  Because the MPSC order completely bypassed and ignored “the detailed process for interconnection set out by Congress” in the Act, the court held it was inconsistent with the provisions of the Act and therefore preempted.  
Verizon North v. Strand
, 309 F.3d at 941.  

We believe the order of the Commission in the case at bar has the same effect of bypassing the process set forth in section 252 of the Act.  The Commission makes it clear that its order “ensure[s] that those carriers that do not have an Interconnection Agreement with Ameritech will have the benefit of the Remedy Plan.”    The Commission does not have the authority to allow a CLEC to take part in a remedy plan without first taking part in the negotiation and arbitration process of section 252.  

Respondents urge us to follow 
Michigan Bell Telephone Co. v. MCIMetro Access Transmission Services, Inc
., 323 F.3d 348 (6th Cir. 2003).  However, in 
Michigan Bell v. MCIMetro
, the CLEC seeking to take advantage of a term in a tariff had an existing interconnection agreement with the ILEC and had already been through the section 252 process.  The court noted, “[t]his case is not one where competing carriers were attempting to bypass the negotiation process that creates interconnection agreements.”  
Michigan Bell v. MCIMetro
, 323 F.3d at 360.  The condition in the tariff that was not present in the interconnection agreement the CLEC was seeking to take advantage of merely allowed the CLEC to fax orders to the ILEC instead of transmitting them via a different electronic medium.  The court noted that “the parties have complied with the Act by engaging in the negotiation and review process.”   
Michigan Bell v. MCIMetro
, 323 F.3d at 360-61.

Here, in ordering the tariff, the Commission allows a “new CLEC” to “opt-in” to the remedy plan and “ensure[s] that those carriers that do not have an Interconnection Agreement with Ameritech will have the benefit of the Remedy Plan.”  Thus, we find this situation much more analogous to that in 
Verizon North v. Strand
 where it was held the MPSC was prohibited from ordering an ILEC 'to file tariffs offering its network elements and services for sale on fixed terms to all potential entrants 
without the necessity of negotiating an interconnection agreement
.'  
(Emphasis in original.)  
Verizon North v. Strand
, 309 F.3d at 939, quoting 
Verizon North
, 140 F. Supp. 2d at 809.

Not only did the Commission through its series of orders impermissibly expand the scope of the Condition 30 remedy plan to apply to CLECs with no interconnection agreements with the Ameritech, it also impermissibly expanded its duration.  

In its final order, the Commission stated that “[t]he only conclusion that can be reached is that Condition 30, and consequently the Remedy Plan, expires in three years. *** Additionally, no party has given us a legal basis for extending the deadlines included in the Merger Order.  We are therefore left with the conclusion that the Remedy Plan, as a condition to merger approval, expires in three years from the merger closing date.”  Ameritech was then directed to file a tariff consistent with the language in the order.  When it did so, the Commission struck language in the tariff noting it was only effective through October 8, 2002.  

In striking the language, the Commission stated that its final order of July 10, 2001 “did not provide for any sunset or automatic termination for that tariffed remedy plan.”  We believe when the Commission used the words “the Remedy Plan *** expires in three years from the merger closing date” it did set a sunset and automatic termination date.  

Moreover, we agree with petitioner that the Commission violated due process by failing to give notice regarding the order on rehearing.  Section 10--113(a) of the Public Utilities Act (220 ILCS 5/10--113(a) (West 2000)) states:

“Anything in this Act to the contrary notwithstanding, the Commission may at any time, upon notice to the public utility affected, and after opportunity to be heard as provided in the case of complaints, rescind, alter or amend any rule, regulation, order or decision made by it.“ 220 ILCS 5/10--113(a) (West 2000). 

This court has held that section 10--113:

“makes clear that the Commission’s power to rescind, alter, or amend its own order can only be exercised after providing notice by means of a written complaint setting forth an alleged violation of the Act, order or rule of the Commission that is filed with the Commission. [Citation.]  Further, an opportunity to be heard must be provided by holding a hearing at a fixed time and place***.” 
Quantum Pipeline Co., v. Illinois Commerce Comm'n
, 304 Ill. App. 3d 310, 319, 709 N.E.2d 950 (1999).  

Failure by the Commission to follow the statutory notice procedures and right to be heard as set forth in section 10--113 violates a party’s procedural due process rights.  
Quantum Pipeline Co.
, 304 Ill. App. 3d 310.  

The July 10, 2001, order of the Commission stated the remedy plan ended on October 8, 2002.  The October 1, 2002, order on reopening deleted the October 8, 2002, remedy plan sunset date contained in Ameritech’s tariff.  Not only did the Commission fail to notify Ameritech of any hearing or proceeding upon which the order on reopening was granted, it also summarily denied Ameritech’s application for rehearing on the order on reopening. Clearly, the Commission’s actions violated Ameritech’s due process rights.  

CONCLUSION

We affirm the part of the Commission’s order that doubles the remedies called for in the original “Texas” remedy plan and which now constitute the revised remedy plan.  We find that the Commission had no authority to allow CLECs that “do not have an Interconnection Agreement with Ameritech” to “have the benefit of the Remedy Plan” as such action subverts the negotiation and arbitration process prescribed by section 252 of the Telecommunications Act of 1996 (47 U.S.C. §252 (2000)).  Finally, we hold that the order on reopening amended the Commission’s July 10, 2002, final order which found there was no legal basis to extend the remedy plan past October 8, 2002.  By failing to notify and provide Ameritech an opportunity to be heard regarding this amendment, the Commission violated Ameritech’s due process rights.   We therefore affirm part of the Commission’s order, reverse part of the Commission’s order and remand this cause to the Illinois Commerce Commission with directions to enter an order consistent with this opinion and afford petitioner due process.

Affirmed in part and reversed in part; cause remanded with directions.

HOLDRIDGE and LYTTON, JJ., concur.